PATIO WORLD, D.B.A. THERMAL SEAL PRODUCTS, APPELLANT, *v.* BETTER BUSINESS BUREAU, INC., APPELLEE.

(No. 10927—Decided January 20, 1989.)

*John R. Ensley,* for appellant.
*Jerry A. Meadows,* for appellee.

BROGAN, J. Appellant, Patio World, d.b.a. Thermal Seal Products, appeals from a summary judgment granted by the trial court on behalf of the appellee, Better Business Bureau, Inc. ("BBB").

In its sole assignment of error, appellant contends the trial court erred in sustaining the defendant's motion for summary judgment.

In its complaint, plaintiff asserted

that on December 2, 1985, January 2, 1986, and March 23, 1986 (and numerous other times) the defendant falsely misrepresented to plaintiff's customers and prospects that plaintiff's home improvement business was not trustworthy and that it failed to satisfy customer complaints.

Plaintiff contended that due to these misrepresentations as to the reputation of the plaintiff, it sustained damages in the sum of $104,000, and unless the defendant was restrained from making certain false accusations plaintiff would be irreparably injured. Plaintiff thus sought damages from the defendant as well as injunctive relief from the trial court.

The defendant answered the complaint and admitted having informed individuals who contacted it that the plaintiff had an unsatisfactory business performance record, as of the date of the inquiries, in that plaintiff showed "a pattern of failure to eliminate the causes of customer complaints." The defendant asserted the affirmative defense that the reports issued by it were fair and impartial reports of complaints of plaintiff's customers and were issued without malice and thus were privileged.

The defendant moved for summary judgment and attached to its motion the affidavit of Timothy Stagich, its president. In the affidavit, Stagich stated the only publication of reports concerning the plaintiff since 1985 to plaintiff's customers inquiring about plaintiff's record had been by employees of the bureau who read a summary over the telephone of a certain report identified as Exhibit "A." Stagich stated the report was made by the bureau based on its review of written complaints of Thermal Seal's customers, any responses of Thermal Seal after the bureau submitted copies of the complaints to Thermal Seal, and any action taken by Thermal Seal.

The report contained the following pertinent information:

"According to our files, this firm has an unsatisfactory business performance record to date. Specifically, our files show a pattern of failure to eliminate the causes of customer complaints."

The defendant also submitted the affidavit of Ron Hess, a supervisor with the BBB. He reiterated the statements of Stagich and also stated the employees of the BBB were trained to read only the entire report to telephone inquirers and no unjustified complaints were considered in the BBB's report on Thermal Seal.

In opposition to the motion, the plaintiff filed several depositions and affidavits. In an affidavit, Neal J. Malatesta stated that on or about November 24, 1986 he informed Thermal Seal he would not be purchasing its windows because the BBB had stated that Thermal Seal had an "unsatisfactory" record in removing the causes of customer complaints. Malatesta stated his understanding of the BBB report was that Thermal Seal would not stand behind its products and workmanship, and therefore "he would not make a sizeable investment in a product that may not be set right if there is a problem."

Debra Garrison stated in an affidavit that she was an employee of Thermal Seal on August 27, 1986, and called the BBB and spoke with an employee identified as "Janice." She stated she inquired about the reputation of Thermal Seal and was informed by the employee that Thermal Seal "had a pattern of failure to eliminate the causes of customer complaints." Garrison stated that when she questioned Janice about the meaning of her statement, she informed Garrison that "if customers file complaints, they (Thermal Seal) don't take care of them"; when asked if Janice meant

"not at all," Janice replied, "it is not to the customer's satisfaction." Garrison stated the BBB's representative further told her to get out of any contract she had entered with Thermal Seal.

Betty Rider stated in an affidavit that John Eliot tried to sell her a home improvement job. She said she called the BBB and was informed by a man, who identified himself as the manager, that Thermal Seal had a very unsatisfactory record and "they made no effort to resolve complaints."

Brent Davis testified by way of deposition that he entered into a contract with Thermal Seal in October 1986 to purchase windows for the price of $6,200. He stated he called the BBB of Dayton a few days later for advice on Thermal Seal's reputation. He stated someone from the BBB informed him that "they had reports that Thermal Seal's workmanship was unsatisfactory." He stated as a result of this report from the BBB he cancelled his contract to purchase the windows.

Plaintiff offered the deposition of Ron Hess, information manager for the BBB of Dayton. Hess identified the BBB's records concerning Thermal Seal. Several of the records concern complaints by consumers about Thermal Seal. The complaints included customer claims of poor workmanship, refusal to make repairs promptly, misrepresentation, high pressure sales techniques, misinformation about financing, etc.

Hess identified the BBB's report of April 7, 1986 on Thermal Seal wherein the experience record portion of the report indicated the firm had an unsatisfactory record in that its files showed "a pattern of failure to eliminate the causes of customer complaints."

Hess explained that it was the practice of the BBB's employees to read the "report" to the inquiring consumer, i.e., that Thermal Seal showed "a pattern of failure to eliminate the causes of customer complaints." Hess explained that while the complaints of consumers registered with the BBB may have involved workmanship, sales practices, or other problems with Thermal Seal, the employee's instructions were to tell the inquiring consumer only what was contained in the official report, i.e., "failure to eliminate the causes of customer complaints." Hess stated the BBB still reported Thermal Seal's performance record as unsatisfactory in 1986 despite the fact Thermal Seal may have resolved its individual customer complaints in 1984 and 1985.

Hess stated the BBB did not report that Thermal Seal did not resolve its customer's complaints, only that the pattern of complaints indicated it failed to eliminate the causes of customer complaints.

Pat Berry, manager of Thermal Seal, testified he called the BBB in March 1986, posing as a customer, and was told by Gary Starks that Thermal Seal was a spin-off of All Seasons, Inc., which ceased doing business in 1980, and that the firm had an unsatisfactory business record because it "failed to eliminate the causes of customer complaints." He said he asked for an explanation, and Starks told him it was not the same company a consumer would want to do business with, and "if you want to do business with a company that is unsatisfactory, then go ahead."

This motion was heard by a referee pursuant to Civ. R. 53. The referee recommended that the defendant's motion for summary judgment be sustained. The referee found that the statements made by the defendant, given a construction most favorable to the plaintiff, are accorded the protection of qualified privilege. The referee found the statements were not de-

famatory at law and therefore were not actionable.

After the plaintiff filed timely objections to the referee's report, the trial court overruled the objections. The court found the defendant possessed a qualified privilege to answer inquiries of the general public as to plaintiff's business performance and there was no evidence of actual malice on the part of defendant to defeat the privilege.

In *Hahn* v. *Kotten* (1975), 43 Ohio St. 2d 237, 72 O.O. 2d 134, 331 N.E. 2d 713, the Ohio Supreme Court held that a qualified privilege protecting the making of defamatory statements is exceeded when the statements are made with "actual malice," that is, with knowledge that the statements are false or with reckless disregard of whether they are false or not.

Justice Corrigan noted at 244, 72 O.O. 2d at 138-139, 331 N.E. 2d at 718-719:

"A qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it. Frequently, in such cases, there is a legal, as well as a moral, obligation to speak. This is most obvious in the case of those who have entered upon or are considering business dealings with one another.

"As stated in 50 American Jurisprudence 2d 698, Libel and Slander, Section 195:

" 'Conditional or qualified privilege is based on public policy. It does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege, *and makes a showing of falsity and actual malice essential to the right of recovery.*

" 'A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. *The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.'* (Emphasis added.)" (Footnotes omitted.)

We agree with the trial court that the defendant is entitled to a qualified privilege in the release of information within its files to the public. It is undisputed that the defendant is a not-for-profit corporation which, *inter alia,* provides reliability reports on businesses and stores in the Miami Valley area upon request so that customers may be served better by ethical providers.

Occasions conditionally privileged afford a protection based upon a public policy which recognizes that it is essential that true information shall be given whenever it is reasonably necessary for the protection of one's own interest, the interests of third persons, or certain interests of the public. In order that such information may be freely given, it is necessary to afford protection from liability for misinformation given in an honest and reasonable effort to protect or advance the interest in question. 3 Restatement of the Law 2d, Torts (1977) 268, Section 595.

In order to advance the interests served by Better Business Bureaus, we agree with those courts which extend the qualified privilege to these non-profit corporations. See *Trim-a-Way Figure Contouring, Ltd.* v. *National Better Business Bureau, Inc.* (1971), 37 App. Div. 2d 43, 322 N.Y. Supp. 2d 154; *Audition Division, Ltd.* v. *Better*

*Business Bureau of Metropolitan Chicago* (1983), 120 Ill. App. 3d 254, 458 N.E. 2d 115; *Antwerp Diamond Exchange of America, Inc.* v. *Better Business Bureau of Maricopa County, Inc.* (1981), 130 Ariz. 523, 637 P. 2d 733.

The communication by the defendant being presumptively privileged, when challenged by the defendant's motion for summary judgment plaintiff was required to come forward with evidentiary facts from which it might be found that the publication was not only false but was actuated by express malice or actual ill-will. *Trim-a-Way Figure Contouring, Ltd.* v. *National Better Business Bureau, Inc., supra,* at 45, 322 N.Y. Supp. 2d at 157.

The defendant offered into evidence in connection with the deposition of Ron Hess the files of the BBB containing numerous complaints by members of the public. Based on these complaints, the BBB's report of April 7, 1986 was read to consumers who inquired about the BBB's experience record with the plaintiff. The report indicated that according *to BBB files,* the firm had an unsatisfactory business performance record. Specifically, BBB files showed "a *pattern* of failure to eliminate the causes of customer complaints." (Emphasis added.) An examination of these files corroborates the findings of the BBB. Numerous complaints were made by consumers in 1984, 1985, and 1986. The BBB was well within its rights to conclude that because of the *numerous complaints* against the plaintiff, as of the date of the April 1986 report, the plaintiff had not eliminated the *causes* of consumer complaints. It may have resolved an individual consumer complaint, but others followed. Truth is an absolute defense to a defamation action. At the very least, the BBB's characterization of the plaintiff's performance record was fair comment or an expression of opinion entitled to constitutional protection. *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323; *Economy Carpets Manufacturers & Distributors, Inc.* v. *Better Business Bureau of Baton Rouge Area, Inc.* (La. App. 1978), 361 So. 2d 234.

To the extent the BBB's employees characterized the plaintiff's performance record as unsatisfactory workmanship, we believe this was a fair comment on the evidence found in the BBB's files.

The most troubling evidence presented by the plaintiff was evidence that BBB employees informed members of the public that the plaintiff would not stand behind its work or *resolve* its customer complaints. Ron Hess, the BBB's manager, stated the BBB did *not* report that the plaintiff did not resolve its customer's complaints. The affidavits of Betty Rider and Debra Garrison belie Hess' testimony, however. Rider stated that she was informed by the BBB when she inquired about the plaintiff that "they made no effort to resolve complaints." Garrison said BBB employees told her Thermal Seal did not take care of its complaints to the satisfaction of its customers.

The BBB's reporting code has categories designated as (1) a record of failure to respond to customer complaints presented by the BBB, (2) a pattern of failure to satisfactorily resolve valid customer complaints, and (3) a pattern of failure to eliminate the causes of customer complaints. It was category (3) which was contained in the BBB's April 7, 1986 report. The BBB apparently decided it was inappropriate, based on a review of its file, to include categories (1) and (2) in its evaluation of the plaintiff's business record.

In *St. Amant* v. *Thompson* (1968), 390 U.S. 727, the United States Supreme Court defined the term

"reckless disregard for the truth" in the definition of "actual malice." The court recognized that the term could receive no single "infallible definition" and that its outer limits would have to be developed in a "case-to-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law." *Id.* at 730-731. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication" in order for recklessness to be found. *Id.* at 731.

Construing the evidence most favorably to the non-movant plaintiff, a jury could conclude that the BBB employees' statements that the plaintiff did not resolve its customer complaints were false and were published with reckless disregard as to the truth of the statements made to members of the public.

We agree with the remarks of Justice Spencer of the Nebraska Supreme Court in *Bartels* v. *Retail Credit Co.* (1970), 185 Neb. 304, 309, 175 N.W. 2d 292, 296, 40 A.L.R. 3d 1039, 1046-1047, wherein he stated:

"We recognize the need for the services of mercantile agencies, but we must not lose sight also of the need to protect an individual from the secret destruction of his good name and reputation. Users of reports of mercantile agencies usually have utmost confidence in the accuracy of such reports and act accordingly. Consequently, the privilege granted to such agencies must be a qualified one. The privilege must be predicated upon the premise that the reporting agency will exercise all reasonable care to ascertain the facts. Such reports must be compiled with regard to the effect the report will have upon the rights of the subject of the report. To be privileged, a mercantile agency's representatives must act impartially and in good faith, carefully evaluating all information before disseminating any defamatory statements to its subscribers. This requires them to make a thorough and complete investigation and to fully and accurately report information only from reliable sources. An erroneous or careless report serves no purpose except to substantially damage the subject of the report, and when once the report is published, the damage has been done and very little can be done to correct it."

It may well be that a member of the consuming public would not transact business with a business which has complaints against it on file with a Better Business Bureau. We live in an imperfect world, and not all businesses perform their services to the optimum on all occasions. Most consumers understand these hazards of everyday life. It is quite another matter to believe that a business will not make good what it has performed badly. Neal Malatesta said it well when he stated, "he would not make a sizeable investment in a product that may not be set right if there is a problem."

For these reasons, we find there were material facts in issue upon which reasonable minds could differ as to whether the defendant slandered the plaintiff and is liable to the plaintiff in damages. The assignment of error is sustained.

The judgment of the trial court will be reversed and the cause is remanded for further proceedings in accordance with this opinion.

*Judgment accordingly.*

WOLFF, P.J., and FAIN, J., concur.